**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| MARITEL, INC., | : | | |
| Plaintiff, | : | Civil Action No.: | 03-2418 (RMU) |
| v. | : | Document Nos.: | 19, 20 |
| THOMAS H. COLLINS *et al*, | : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

**DENYING THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;**
**GRANTING THE DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This case concerns a final rule promulgated by the United States Coast Guard which implements a system of marine communications between the Coast Guard and certain ships. The plaintiff, Maritel, Inc. ("Maritel"), brings suit against the Coast Guard and Thomas H. Collins in his official capacity as Admiral and Commandant of the Coast Guard (collectively, "the defendant" or " the Coast Guard") under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 702 *et seq.*, asking the court to set aside the Coast Guard's rule. The plaintiff alleges that the Coast Guard's rule is arbitrary and capricious, an abuse of discretion and contrary to law. Specifically, the plaintiff alleges that the Coast Guard's rule violates section 301 of the Communications Act of 1934, 47 U.S.C. §§ 301 *et seq.*, and the Fifth Amendment takings clause, and does not reasonably address the plaintiff's formally-submitted comments to the rule.

The plaintiff has filed a motion for summary judgment and the defendant has filed a motion to dismiss or for summary judgment. Because the Coast Guard's Final Rule promulgates

equipment requirements, as authorized by the Federal Communications Commission ("FCC"), rather than frequency requirements, and because the Coast Guard gave due consideration to the plaintiff's comments, its decision is not arbitrary and capricious, an abuse of discretion, or otherwise contrary to law. Accordingly, the court denies the plaintiff's motion for summary judgment and grants the defendant's motion for summary judgment as to the plaintiff's APA claims. Because the plaintiff's Fifth Amendment takings claim is not ripe for review, the court dismisses that claim.

## II. BACKGROUND

### A. Factual Background

The plaintiff, a maritime communications firm, is a current FCC licensee for Variable Public Coast ("VPC") Channels 87A, 87B, 88A, and 88B. Compl. ¶¶ 2, 12. In 1997, one year before the plaintiff acquired licenses for these channels, the Coast Guard requested that the FCC designate Channels 87B and 88B for use in the Automatic Identification System[1] ("AIS"), which assists in preventing collisions and allows the Coast Guard to monitor naval traffic. *Id*. ¶¶ 9, 14. The FCC denied the Coast Guard's request and instructed it to negotiate directly with VPC licensees to select frequencies for AIS. *Id*. ¶ 15; Maritime Communications, 13 F.C.C.R. 19,853, 19,876-77 ¶¶ 48-49 (1998) ("the 1998 FCC Decision") (codified at 47 C.F.R. § 80.371(c)(3)).

---

[1] The Automatic Identification System (AIS) is a shipboard broadcasting transponder system in which ships continually transmit their unique identification number, position, course, speed and other data to all nearby ships and shoreside authorities on a common channel. Automatic Identification System; Vessel Carriage Requirements, 68 Fed. Reg. 60,559, 60,559 (Oct. 22, 2003). Certain ships are required to carry AIS equipment pursuant to the International Convention for the Safety of Life at Sea, 1974, as amended, and the Coast Guard's regulations. *Id.*

The FCC, through regulation, required the Coast Guard to submit to each VPC licensee, within six months of the conclusion of competitive bidding procedures for the licenses, a proposed plan specifying two "narrowband" channel pairs for AIS use. 47 C.F.R. § 80.371(c)(3). If an agreement could not be reached within one year of the Coast Guard's proposal, the Coast Guard could petition the FCC to select the AIS channels itself. *Id.*

At a subsequent FCC public auction, the plaintiff paid over $6.8 million for all nine maritime VPC licenses to build a marine communications system. Compl. ¶ 12. And, in accordance with the 1998 FCC decision, the plaintiff and the Coast Guard negotiated a "Memorandum of Agreement" ("MOA"), which allowed the Coast Guard to use Channels 87A and 87B. *Id.* ¶ 16. The FCC's Wireless Telecommunications Bureau issued a Public Notice in June 2002 that acknowledged the MOA and authorized the temporary use of shipborne AIS equipment on "existing ship station licenses." Add'l Freq. for the U.S. Coast Guard's Ports and Waterways Safety Sys. ("June 2002 Public Notice"), 17 F.C.C.R. 10,960 (June 13, 2002).

Meanwhile, as a result of the Coast Guard's allegedly contrary interpretation of a separate MOA provision,[2] the plaintiff notified the Coast Guard in May 2003 that it was invoking the MOA's termination clause. Pl.'s Statement of Facts ¶ 22. The plaintiff told the Coast Guard that it was willing to renegotiate to find other suitable AIS frequencies, but the Coast Guard proceeded to publish an Interim Rule implementing the AIS and soliciting comments from interested parties. *Id.* ¶ 23; Automatic Identification System; Vessel Carriage Requirement ("AIS Interim Rule"), 68 Fed. Reg. 39,353 (proposed July 1, 2003). The interim rule laid out the Coast

---

[2] Among other things, the dispute concerns a provision of the Memorandum of Agreement ("MOA") concerning "narrowband" versus "wideband" use: the plaintiff asserts that the MOA required the Coast Guard to use Channels 87A and 88B in "narrowband" format, while the Coast Guard claims it allowed "wideband" use. Compl. ¶ 18.

Guard's requirement that certain types of vessels install AIS equipment ("carriage requirements") by a certain date. *Id.* at 39,367. The Interim Rule also incorporated several international standards, one of which envisioned that AIS equipment would operate by default on Channels 87B and 88B. *Id.* at 39,359 (requiring that certain vessels install AIS that complies with International Telecommunication Union Recommendation M.1371-1); Technical Characteristics for a Universal Shipborne Automatic Identification System, Recommendation ITU-R M.1371-1, Annex 2, Table 2 (Def.'s Mot., Ex. 2) ("ITU Recommendation").

The plaintiff formally submitted four comments in response to the Interim Rule. First, the plaintiff claimed that the Coast Guard did not have authorization to require shipowners to install and operate AIS transmitters that broadcast on Channel 87B because the MOA no longer existed. Compl. ¶ 24. Second, the plaintiff charged that the Coast Guard had unilaterally taken Channel 88B without attempting to negotiate for it, in violation of the 1998 FCC decision. *Id.* Third, the plaintiff submitted an independent engineering study that purportedly demonstrated that the parties' competing uses of Channels 87B and 88B would cause harmful mutual interference. *Id.* ¶ 25. Finally, the plaintiff commented that AIS's interference with the plaintiff's licensed channels would render those channels useless and thus constituted a Fifth Amendment taking. *Id.* ¶ 26.

On October 22, 2003, the Coast Guard published its Final Rule. Automatic Identification System; Vessel Carriage Requirement, 68 Fed. Reg. 60,559, 60,563 (October 22, 2003) ("AIS Final Rule") (codified at 46 C.F.R. pts. 26, 161, 164-65). In its comments to the Final Rule, the Coast Guard asserted that it "requested and received frequency authorizations from the Federal Communications Commission (FCC) and the National Telecommunication and Information

Agency (NTIA)." *Id*.; Compl. ¶ 27. The Coast Guard cited the Wireless Telecommunications Bureau's June 2002 Public Notice to support its conclusion that "FCC policies currently authorize" use of Channels 87B and 88B for AIS. Compl. ¶ 27; AIS Final Rule, 68 Fed. Reg. at 60,563.

When the plaintiff filed its complaint, several proceedings were pending before the FCC involving the Coast Guard's authority to use Channels 87B and 88B for AIS and the related AIS rule-making. Compl. ¶ 30. The plaintiff submitted four of these matters before the Coast Guard published its Final Rule. *Id*. Two days after the Coast Guard published the Final Rule, the NTIA, at the behest of the Coast Guard, submitted a petition to the FCC to designate Channels 87B and 88B for AIS. *Id*. On November 21, 2003, the Coast Guard's Final Rule went into effect and the plaintiff filed its complaint. Pl.'s Mot. at 6.

Since commencement of this action, the FCC published a Memorandum Opinion and Order and Notice of Proposed Rule Making regarding AIS and Channels 87B and 88B, in which it decided that Maritel's right to use of Channel 88B is subject to coordination with the FCC, and declaring 88B a federal channel for AIS use. Maritime Automatic Identification Systems, 19 F.C.C.R. 20,071, 20,084-88 (Aug. 26, 2004).[3] The FCC also gave notice of a proposed rulemaking to consider the NTIA's formal request that 87B be assigned exclusively to the Coast Guard for AIS use. *Id.* at 20,088-89. The outcome of this proposed rulemaking is as yet undetermined.

---

[3] Accordingly, the plaintiff concedes its claims as to Channel 88B. Pl.'s Mot. at 6.

### B. Procedural Background

On January 20, 2004, the defendant filed a motion to dismiss arguing that the court did not have subject-matter jurisdiction over the present action and that the case was not ripe because a decision regarding the Coast Guard's authority to use Channels 87B and 88B for AIS was pending with the FCC. On August 3, 2004, the court denied the defendant's motion to dismiss, holding that because the plaintiff seeks APA review of the Coast Guard's Final Rule, an action already taken by the defendant, the case was ripe. Mem. Op. (August 3, 2004) at 9-12. Additionally, because the plaintiff paid the FCC millions of dollars for licenses to use Channels 87B and 88B (among others) and the Coast Guard's Final Rule requires several classes of ships to use equipment that broadcasts on those channels, the plaintiff's alleged harm constitutes an injury that is distinct and palpable, not conjectural or hypothetical. *Id.* at 13. Lastly, the court held that because "the matter is an issue of law within the conventional expertise of the court, and because the complaint states a proper claim under the APA," the court would not defer to the FCC's primary jurisdiction or dismiss the complaint for failure to state a claim. *Id.* at 14.

On March 4, 2005, the plaintiff moved for summary judgment, arguing that the Coast Guard's Final Rule was arbitrary and capricious because it lacked FCC authorization for its AIS carriage requirements, that it failed to give due consideration to the plaintiff's interference comments, and that it constituted a regulatory taking without just compensation. *See generally* Pl.'s Mot. Also on that day, the defendant filed a renewed motion to dismiss or for summary judgment. The defendant argues that the Coast Guard's actions were not arbitrary and capricious because it acted according to FCC authorization and because the Coast Guard properly considered Maritel's comments. Def.'s Mot. at 8-14.

## III. ANALYSIS

### A. Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150,

154 (D.C. Cir. 1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

**B. Legal Standard for Judicial Review of Agency Actions**

The APA entitles "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . to judicial review thereof." 5 U.S.C. § 702. Under the APA, a reviewing court must set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706; *Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 736 (D.C. Cir. 2001). In making this inquiry, the reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotations omitted). At a minimum, the agency must have considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986); *Tourus Records*, 259 F.3d at 736. An agency action usually is arbitrary or capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also County of L.A. v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) ("Where the agency has failed

to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action").

As the Supreme Court has explained, however, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Veh. Mfrs. Ass'n*, 463 U.S. at 43. Rather, the agency action under review is "entitled to a presumption of regularity." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

Section 706 of the APA directs a court evaluating an agency action to "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706; *Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992); *Natural Res. Def. Council, Inc. v. Train*, 519 F.2d 287, 291 (D.C. Cir. 1975). The court's review must "be based on the full administrative record that was before the [agency] at the time [it] made [its] decision." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582 (D.C. Cir. 2001).

Because the court's review is confined to the administrative record at the time of the agency's decision, it may not include "some new record made initially in the reviewing court."[4] *Ctr. for Auto Safety*, 956 F.2d at 314 (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)); *Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C. Cir. 1991). To ensure fair

---

[4] "The rationale for this rule derives from a commonsense understanding of the court's functional role in the administrative state[:] 'Were courts cavalierly to supplement the record, they would be tempted to second-guess agency decisions in the belief that they were better informed than the administrators empowered by Congress and appointed by the President.'" *Amfac Resorts, L.L.C. v. Dep't of Interior*, 143 F. Supp. 2d 7, 11 (D.D.C. 2001) (quoting *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 751 F.2d 1287, 1325-26 (D.C. Cir. 1986)).

review of an agency action, therefore, the court "should have before it neither more nor less information than did the agency when it made its decision." *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997) (citing *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984)). As this circuit put it, for a court "to review *less* than the full administrative record might allow a party to withhold evidence unfavorable to its case," while "to review *more* than the information before the [agency] at the time [of its] decision risks our requiring administrators to be prescient or allowing them to take advantage of post hoc rationalizations." *Boswell*, 749 F.2d at 792 (emphasis added).

To ensure that the administrative record contains "neither more nor less" information than was before the agency, courts in this circuit have directed agencies to collect those materials "that were compiled by the agency that were before the agency at the time the decision was made." *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996); *Common Sense Salmon Recovery v. Evans*, 217 F. Supp. 2d 17, 20 (D.D.C. 2002). More specifically, the record must include all documents and materials that the agency "directly or indirectly considered." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993); *Amfac Resorts, L.L.C. v. Dep't of Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001); *Novartis Pharms. v. Shalala*, 2000 WL 1769589, at *2 (D.D.C. Nov. 27, 2000); *Alaska Excursion Cruises v. United States*, 603 F. Supp. 541, 550 (D.D.C. 1984); *see also Pers. Watercraft Indus. Ass'n v. Dep't of Commerce*, 48 F.3d 540, 546 n.4 (D.C. Cir. 1995) (noting with approval that the "whole record" contained all materials "pertaining to the [challenged] regulation").

The agency may not skew the record in its favor by excluding pertinent but unfavorable information. *Envtl. Def. Fund v. Blum*, 458 F. Supp. 650, 661 (D.D.C. 1978). Nor may the

agency exclude information on the grounds that it did not "rely" on the excluded information in its final decision. *Ad Hoc Metals Coalition v. Whitman*, 227 F. Supp. 2d 134, 139 (D.D.C. 2002); *Amfac Resorts*, 143 F. Supp. 2d at 12. On the other hand, an agency may exclude arguably relevant information that is not contained in the agency's files but that may be available from third parties. *Blum*, 458 F. Supp. at 661 n.4. In addition, an agency generally may exclude material that reflects internal deliberations. *Amfac Resorts*, 143 F. Supp. 2d at 13 (noting that deliberative intra-agency records ordinarily are privileged); *Seabulk Transmarine I, Inc. v. Dole*, 645 F. Supp. 96, 201 (D.D.C. 1986).

Although an agency may not unilaterally determine what constitutes the administrative record, the agency enjoys a presumption that it properly designated the administrative record absent clear evidence to the contrary. *Bar MK Ranches*, 994 F.2d at 739-40 (stating that the administrative record enjoys the same presumption of regularity afforded to other established administrative procedures); *Amfac Resorts*, 143 F. Supp. 2d at 12 (noting the "standard presumption" that the agency designated the administrative record properly); *Zeneca Inc. v. Shalala*, 1999 WL 728104, at *3 (D. Md. Aug. 11, 1999) (observing that the administrative record enjoys a presumption of regularity); *see also Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (stating that "[t]he task of the reviewing court is to apply the appropriate APA standard of review . . . based on *the record the agency presents* to the reviewing court") (emphasis added); *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 751 F.2d 1287, 1324 (D.C. Cir. 1986) (noting that "[i]n discharging their obligation to monitor agency action, courts review a record *compiled by the agency*").

### C. The Coast Guard's Final Rule is not Arbitrary and Capricious

The plaintiff argues that the Coast Guard's Final Rule was arbitrary and capricious in violation of the APA, and should therefore be set aside. Pl.'s Mot. at 10-16. Specifically, the plaintiff argues that (1) the Coast Guard's Final Rule is contrary to law and a "clear error of judgment" because it requires use of Channel 87B without authorization from the FCC, *id*. at 10-11; and that (2) the Coast Guard failed to give due consideration to the plaintiff's comments with respect to interference and did not provide a reasonable basis for its decision, *id.* at 13-16. The court rejects both of these arguments for the reasons set forth below, and grants summary judgment for the plaintiff's APA claims.

#### 1. The Coast Guard's Final Rule Promulgates Equipment Requirements, Not Frequency Requirements

The Communications Act of 1934 grants the Federal Communications Commission exclusive authority to grant or modify licenses authorizing the use of equipment for transmission over radio frequencies.[5] 47 U.S.C. § 301. The plaintiff identifies as its "fundamental contention" that "the Coast Guard is wrongfully *using* channels exclusively licensed to Maritel to

---

[5] The Communications Act of 1934 provides that "[n]o person shall *use or operate any apparatus* for the transmission of energy or communications or signals by radio . . . except under and in accordance with this chapter and with a license in that behalf granted under the provisions of this chapter." 47 U.S.C. § 301 (emphasis added).

accomplish its goals,"[6] in violation of its authority. *Id.* at 10 (emphasis added). Specifically, the plaintiff argues that, because the FCC has yet to issue a formal rule assigning Channel 87B for AIS use by the Coast Guard and because the MOA between Maritel and the Coast Guard had been terminated, the Final Rule AIS carriage requirements were contrary to law and a "clear error of judgment." Pl.'s Mot. at 10-11 (citing *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)). The Coast Guard's Final Rule required the use of specific equipment rather than specific channel frequencies, and thus did not exceed authorizations granted by the FCC. In other words, because the Coast Guard promulgated its Final Rule in accordance with a broad temporary grant of authorization by the FCC to implement AIS equipment during the pendency of ongoing rulemaking procedures, the Final Rule is not contrary to law.

The Coast Guard's Final Rule neither asserts the right to use a particular frequency nor does it require vessels regulated by the rule to do so. In fact, the Coast Guard's Final Rule itself does not mention Channel 87B. The Final Rule requires only that certain vessels "must have a

---

[6] Despite its many assertions to the contrary, Maritel does not enjoy an "exclusive" right to use Channel 87B; the Federal Communications Commission ("FCC") has broad power to reclaim or alter frequency licences, even when using competitive bidding procedures to determine licensees. 47 U.S.C. § 301 (stating that the Communications Act provides "for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority," and stating that "no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license"); *id.* § 309(j)(6)(C) (stating that the FCC would retain its authority "to regulate or reclaim spectrum licenses" under competitive bidding procedures); *id.* § 309(j)(6)(D) (stating that nothing in the use of competitive bidding procedures should "be construed to convey any rights . . . that differ from the rights that apply to other licenses"); *see also Celtronix Telemetry, Inc. v. FCC*, 272 F.3d 585, 589 (D.C. Cir. 2001) (noting that "it is undisputed that the Commission always retained the power to alter the terms of existing licenses by rulemaking").

properly *installed, operational, type approved* AIS as of the date specified."[7] AIS Final Rule, 68 Fed. Reg. at 60,569 (emphasis added). The Coast Guard's Final Rule does, however, require that AIS equipment comply with certain international standards. *See id.* at 60,570 (defining "type approved" as including compliance with International Maritime Organization ("IMO") Resolution MSC.74(69), International Telecommunications Union ("ITU") Recommendation M.1371-1, and International Electrotechnical Commission ("IEC") Recommendation 61993-2). One such standard is the ITU Recommendation, which designates Channels 87B and 88B as default frequencies for AIS use. *See* ITU Recommendation (Def. Mot., Ex. 2); Def.'s Statement of Facts ¶ 2. But the ITU standard does not require that ships broadcast over 87B.[8]

---

7 At various points in its complaint and motion for summary judgment the plaintiff claims that the Coast Guard is wrongfully "using" Channel 87B. *See, e.g.*, Pl.'s Mot at 3 (claiming that the Final Rule "require[s] transmission on Channel 87B"). Because the plaintiff only challenges the Coast Guard's Final Rule in its complaint, however, the court restricts its analysis to the regulations contained in that rule, which do not require "use" of any particular frequency, but rather that certain vessels install operational and type approved AIS equipment. The plaintiff urges the court to place significance on the Preamble to the Coast Guard's Final Rule, where the Coast Guard noted its lack of authority to designate particular frequencies for AIS use, and asserted that the June 2002 Public Notice gave the Coast Guard authorization for "use" of Channel 87B. AIS Final Rule, 68 Fed. Reg. at 60,563 (stating that "FCC policies currently authorize" use of Channel 87B for AIS). Regardless of the precise accuracy of this claim by the Coast Guard, it cannot carry the Final Rule's regulations farther than their express terms, and the confusion this claim may demonstrate regarding the difference between carriage requirements and frequency authorizations is not itself a basis for setting aside the Final Rule. *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (stating that an agency's decision of "less than ideal clarity" will be upheld if the agency's rationale "may reasonably be discerned"). As explained *infra*, while no authorization to use specific frequencies was granted by the Public Notice, the FCC's broad grant of temporary authority included authorization to implement AIS equipment designed to operate by default on Channel 87B.

8 The World Radiocommunication Conference ("WRC") Final Acts permit member administrations to designate alternative channels other than 87B and 88B for AIS use if such channels are unavailable, and amended the International Telecommunications Union ("ITU") Recommendation accordingly. WRC-97 Final Acts (1997) at 196 (Def.'s Mot., Ex. 5).

The Coast Guard promulgated the AIS carriage requirements contained in its Final Rule pursuant to the Maritime Transportation Security Act of 2002 ("MTSA"), which directed the Coast Guard to prescribe regulations requiring certain vessels to be "equipped with and operate" AIS, 46 U.S.C. § 70114(a), "as soon as practicable after the date of enactment of this section," *id.* § 70101 note. Shortly after the MOA became effective, the FCC granted temporary authorization for "the use of shipborne AIS equipment" over "existing ship station licenses." June 2002 Public Notice, 17 F.C.C.R. at 10,961. The Public Notice provided, in relevant part:

> The International Maritime Organization Safety Committee approved carriage requirements for shipborne AIS equipment to be phased in beginning July 1, 2002. In addition, AIS ship station equipment is expected to become available in the United States in the near future. The Commission's Rules currently do not set forth licensing, equipment certification, or frequency coordination requirements for AIS. These matters will be addressed in a pending rulemaking proceeding. *Until such time,* the Bureau will consider use of shipborne AIS equipment to be authorized by existing ship station licenses, including vessels that are licensed by rule.

*Id.* (emphasis added) (citations omitted).

In July of 1998, prior to the 1999 auction at which the plaintiff acquired its licenses, the Commission denied a petition by the Coast Guard to designate Channel 87B as an exclusive AIS

channel. 13 F.C.C.R. 19,853, 19,876 (July 6, 1998). Instead, the FCC established a competitive bidding process for VPC licenses, intending to rely primarily on negotiations between the Coast Guard and the licensee to designate channels for AIS use:

> [W]ithin six months of the competitive bidding procedures to determine the licensees in each VPCSA, the U.S. Coast Guard shall submit to each licensee . . . a plan specifying up to two narrowband channel pairs . . . for use in the PAWSS. The final selection of the PAWSS channel pairs can be negotiated (if the VPCSA licensee objects to the Coast Guard proposal, it shall make a counterproposal within three moths) and established by an agreement between the parties. All parties are required to negotiate in good faith. If no agreement is reached within one year of the date the Coast Guard submitted its plan, the Coast Guard may petition the Commission to select the channel pairs.

47 C.F.R. § 80.371(c)(3) (citations omitted).

FCC regulations, therefore, provided for a schedule of negotiations and a course of action should an agreement not be reached. Nevertheless, however, the FCC regulations are unclear as to how the Commission would handle a situation where the Coast Guard and the licensee, having reached a good faith agreement previously, subsequently terminate that agreement.

Thus, the Coast Guard promulgated its Final Rule in the midst of the following regulatory situation: (1) Congress had expressly directed it to promulgate regulations requiring vessels be equipped with and operate AIS; (2) subsequent to the MOA between the Coast Guard and Maritel, the FCC had temporarily authorized the use of shipborne AIS equipment "by existing ship station licenses" until it promulgated a final rule regarding "licensing, equipment certification, or frequency coordination requirements for AIS"; and (3) the MOA, which had previously authorized AIS use over Channel 87B, had been terminated, and FCC regulations were unclear as to what obligations either the Coast Guard or Maritel had in such a situation regarding selection of channels for AIS use.

The plaintiff essentially argues that, in this state of "regulatory flux," a Coast Guard rule requiring vessels to install AIS equipment that operates by default on Channel 87B exceeds its statutory authority and usurps the FCC's exclusive authority to grant licenses for use of public VPC channels. Pl.'s Mot. at 10-12. Specifically, the plaintiff argues that the FCC's June 2002 Public Notice did not grant the Coast Guard authority to promulgate its Final Rule because it was "based solely upon the Coast Guard's representation that it had already obtained the necessary spectrum [Channel 87B] through bargaining." Pl.'s Mot. at 4 n.3. Once the MOA was terminated, according to the plaintiff, "a necessary predicate underlying the Public Notice was gone and there was no longer any authority to operate the AIS equipment approved in the Public Notice." *Id.* The court rejects these arguments.

The 2002 Public Notice did not restrict its temporary approval of shipborne AIS equipment, however, to the period during which the MOA remained in force. June 2002 Public Notice, 17 F.C.C.R. at 10,960. Rather, the temporary authorization applied to all "existing ship station licenses, including vessels that are licensed by rule" during the pendency of *rulemaking procedures*, regarding not only equipment certification, but frequency licensing. *Id.* Moreover, a subsequent FCC Public Notice demonstrates the FCC's intention to authorize the use of AIS equipment pending future rulemaking, and not the maintenance of the MOA. On June 27, 2002, the FCC issued a Public Notice that noted the importance of AIS to Homeland Security in light of the events of September 11, 2001, and expressed its intention to "coordinate review of applications for certification of AIS equipment with the United States Coast Guard to ensure that the equipment meets all applicable international standards and requirements." Applications For Equipment Authorization of Universal Shipborne Automatic Identification Systems, 17 F.C.C.R.

11,983, 11,983 (June 27, 2002). The FCC expressly identified the ITU Recommendation as one of these "international standards and requirements." *Id.* at 11,983 n.2.

Read together, these Public Notices demonstrate that the FCC granted authorization for implementation of AIS carriage requirements until it could promulgate final rules regarding equipment and licensing, and that it was aware that this equipment would be governed by international standards setting 87B as a default channel.[9] Given the clear statutory direction to the Coast Guard to require vessels to be "equipped with and operate" AIS, 46 U.S.C. § 70114(a), and the FCC's broad temporary authorization of implementation of this equipment during the pendency of rulemaking, the Coast Guard's Final Rule was not contrary to law or a clear error of judgment.

---

[9] Furthermore, the court's analysis is consistent with the FCC's understanding of the meaning of these two Public Notices, as expressed in its recent Memorandum Opinion and Order and Notice of Proposed Rule Making regarding designation of 87B as an exclusive AIS frequency. Maritime Automatic Identification Systems, 19 F.C.C.R. at 20,777 (stating that "[t]he effect of these two public notices . . . then, was to clarify that, in the interest of homeland security, deployment of AIS equipment designed to operate on Channels 87B and 88B could continue in the interim before AIS licensing, operating and equipment certification requirements were codified in the Commission's Rules"). Although this clarification was not made until well after the promulgation of the Coast Guard's Final Rule, and is not dispositive, a court must "necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt." *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413-15 (1945). Furthermore, while the FCC clarified its interpretation of its Public Notices two years after promulgation of these Notices in a Notice of Proposed Rulemaking, this fact does not diminish its persuasiveness. *Auer v. Robbins*, 519 U.S. 452, 462 (1997) (finding that an agency's subsequent interpretation of it's own regulation in an *amici* brief was "in no sense a 'post hoc rationalization' advanced by an agency seeking to defend past agency action against attack") (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988)). For the reasons explained, the court finds that this interpretation of the Public Notice is not "plainly erroneous or inconsistent with the regulation." *Id.* at 461.

**2. The Defendant Gave Due Consideration to Maritel's Comments**

The court's resolution of the disputed scope of the authorization granted the Coast Guard by the FCC June 2002 Public Notice disposes with the crux of the plaintiff's remaining APA claims. The plaintiff also argues, however, that the Final Rule was arbitrary and capricious because the Coast Guard failed to give due consideration to Maritel's comments regarding the harmful interference to its channels that implementation of AIS would cause. Pl.'s Mot. at 14. To the extent this claim alleges APA violations independent of the Coast Guard's reliance on the FCC's June 2002 Public Notice, it is nonetheless without merit for the reasons set forth below.

The plaintiff complains that its interference comments, which included an independent engineering study as to the effects AIS would have on Maritel's and other users' licensed spectrums, were dismissed "with no discussion of their substance" by the Coast Guard. *Id.* at 15. The Coast Guard's Final Rule responded to Maritel's interference comments in two important ways. First, the Coast Guard suggested that serious interference problems might not arise because AIS devices were required to go through an additional level of review not required of most other FCC certified radio equipment, and because the installation of AIS would be governed by international guidelines. AIS Final Rule, 68 Fed. Reg. at 60,563. Second, the Coast Guard recognized the possibilities for radio interference, and promised to "be diligent in monitoring AIS use for interferences," and to "promptly mitigate them by enforcing the required installation guidelines, through the AIS type approval process, and through frequency plan coordination with existing public coast station licensees." *Id.*

The independent study submitted by Maritel in its comments to the Coast Guard did not conclude that damaging interference would render any adjacent channels useless. Rather, the study recommended that use of AIS and radiotelephones be "jointly planned for appropriate

horizontal or vertical separation to minimize interference to both systems." Def.'s Mot., Ex. 2 at 309. In effect, Maritel relied on a study that demonstrates a need for coordination between the Coast Guard and existing licensees to request that the Coast Guard refrain from issuing its carriage requirements altogether.[10] *Id.* at 302. Thus, even accepting Maritel's independent study as accurate, the Coast Guard could still reasonably conclude that cooperation and joint-planning could alleviate the concerns of other licensees with adjacent spectrums, and therefore that abandonment of its carriage requirements was unnecessary.[11] *See Bowman Trans., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 288 (1974) (holding that even if the Interstate Commerce Commission had accepted at "face value" exhibits demonstrating that service provided by existing motor carriers was "generally acceptable," the Commission was nonetheless justified in concluding that deficiencies were sufficient enough to warrant admission of additional carriers).

This conclusion is not disturbed by the plaintiff's allegation that the Coast Guard "dismissed [its] concerns curtly," without discussing "whatsoever . . . the technical data and

---

[10] "Realizing that there is no agreement allowing the [Coast Guard] to use MariTEL's channel 87B and adjacent spectrum for AIS in the U.S.; that the use of [AIS equipment incorporating the ITU Recommendation] causes significant implications to both the AIS and MariTEL's operations and that the AIS carriage requirement is effective immediately—which allows no time for resolution of these issues, MariTEL urges the [Coast Guard] to suspend its carriage requirements until such time as these issues are resolved." Def.'s Mot., Ex. 2 at 302.

[11] The unreasonableness of this alternative was at least implicitly recognized by the Coast Guard in response to a comment requesting the implementation date for AIS be postponed for two years–the Coast Guard noted that such a date was "beyond the deadline date established by the [Maritime Transportation Security Act of 2002] ("MTSA")." AIS Final Rule, 68 Fed. Reg. at 60,562. Indeed, had the Coast Guard not promulgated its Final Rule before November 25, 2003, its interim rule would have expired on that date without being superseded by a final rule – clearly a result not intended by Congress. 46 U.S.C. § 70101 note.

engineering report that MariTEL submitted[.]" Pl.'s Mot. at 15. The Coast Guard did not dispute Maritel's submitted report, but acknowledged the potentiality for interference. AIS Final Rule, 68 Fed. Reg. at 60,563. Given the Coast Guard's reasonable determination that, in accordance with the plaintiff's study, the suitability of diligent monitoring and frequency coordination was sufficient to mitigate interference, it was under no obligation to devote paragraphs specifically exploring the details of Maritel's submitted report in its Final Rule. *See Howes Leather Co., Inc. v. Golden*, 681 F. Supp. 6, 12 (D.D.C. 1987) (finding that the fact that an agency's analysis "*could have been* more sophisticated" does not demonstrate that the agency "lacked a rational basis for its decision") (emphasis in original); *Automotive Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968) ("We do not expect the agency to discuss every item of fact or opinion included in the submissions made to it in informal rulemaking").

In sum, the plaintiff has failed to allege that the Coast Guard's Final Rule relied on factors Congress intended it not to consider, that the Coast Guard did not consider the potential interference problem, that it gave an explanation for its decision in contradiction to the evidence before it, or that the Final Rule was "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Given its express statutory direction to implement AIS carriage requirements "as soon as practicable," 46 U.S.C. § 70114(a), the Coast Guard acted reasonably in choosing an alternative method of dealing with potential resulting interference, and in rejecting the plaintiff's request that it delay AIS implementation altogether. Because the Coast Guard's Final Rule did not violate the Communications Act of 1934, 47 U.S.C. § 301, and was not arbitrary and capricious under the APA, 5 U.S.C. § 706, the court grants the defendant's motion for summary judgment as to these claims.

**D. The Plaintiff's Regulatory Takings Claim is Not Ripe**

Finally, the plaintiff argues that the Final Rule constituted an unlawful taking without justification of Maritel's interest in Channel 87B, and was therefore contrary to law.[12] Pl.'s Mot at 16. A claim for a regulatory taking "is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985). As previously explained, the Coast Guard Final Rule's carriage requirements were temporarily authorized by the FCC, and the FCC has exclusive authority to grant such authorizations. 47 U.S.C. § 301. The FCC is currently engaged in rulemaking regarding a proposal to designate Channel 87B for exclusive AIS use, including the potential interference to Maritel's adjacent channels that may result from AIS use on Channel 87B. Maritime AIS, 19 F.C.C.R. 20,071, 20,088 (Aug. 26, 2004). Maritel participated in this notice and comment rulemaking, opposing this designation. *Id.* And, because the FCC has yet to render its decision, the plaintiff's administrative remedies before the FCC have not yet been exhausted and the plaintiff's regulatory takings claim is, in turn, not ripe. *See, e.g., Morris v. United States*, 392 F.3d 1372, 1376 (Fed. Cir. 2004) (stating that "[w]here further administrative process could reasonably result in a more definite statement of the impact of the regulation, the property owner is generally required to pursue that avenue of relief before bringing a takings claim"); *Greenbrier v. United States*, 193 F.3d 1348, 1359 (Fed. Cir. 1999) (stating that the

---

[12] Despite the plaintiff's confused attempt to frame its Fifth Amendment takings clause argument in terms of the Coast Guard's allegedly inadequate consideration of the plaintiff's comments to the Final Rule (which argued that the Final Rule would constitute a taking without just compensation), Pl.'s Mot. at 16-17, the court assumes the plaintiff means to assert this claim directly.

"failure to follow all applicable administrative procedures can only be excused in the limited circumstance in which the administrative entity has no discretion regarding the regulation's applicability and its only option is enforcement").[13] Accordingly, the court dismisses the plaintiff's takings claim.

## IV. CONCLUSION

For the foregoing reasons, the court grants the defendant's motion for summary judgment as to the plaintiff's APA claims, and dismisses the plaintiff's Fifth Amendment takings claim. An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 20th day of March, 2006.

RICARDO M. URBINA
United States District Judge

---

[13] Furthermore, even if the plaintiff's regulatory takings claim becomes ripe as result of the FCC's conclusion of rulemaking regarding Channel 87B, this claim must be brought against the FCC exclusively in the Court of Appeals for the District of Columbia. *FCC v. ITT World Commc'n, Inc.*, 466 U.S. 463, 468 (1984) (stating that "[e]xclusive jurisdiction for review of final FCC orders . . . lies in the Court of Appeals . . . Litigants may not evade these provisions by requesting the District Court to enjoin action that is the outcome of the agency's order"); *Ordower v. Office of Thrift Supervision*, 999 F.2d 1183, 1188 (7th Cir. 1993) (stating that "[w]hen Congress places review of an administrative decision in the court of appeals, district judges may not enjoin or penalize action that the agency has approved").